METROPOLITAN POLICE RETIRING
ASSOCIATION, INC., Appellant,

v.

Walter N. TOBRINER et al., Board of
Commissioners for the District of
Columbia, Appellees.

No. 16762.

United States Court of Appeals
District of Columbia Circuit.

Argued May 3, 1962.

Decided June 21, 1962.

Mr. Richard L. Walsh, Washington, D. C., for appellant.

Mr. Richard W. Barton, Assistant Corporation Counsel for the District of Columbia, with whom Messrs. Chester H. Gray, Corporation Counsel, Milton D. Korman, Principal Assistant Corporation Counsel, and Hubert B. Pair, Assistant Corporation Counsel, were on the brief, for appellees.

Before BAZELON, FAHY and BASTIAN, Circuit Judges.

FAHY, Circuit Judge.

The Superintendent of Insurance is head of the Department of Insurance of the District of Columbia, which functions under the direction of the Commissioners.[1] The Metropolitan Police Retiring Association, Inc., was thought by the Commissioners to be engaged in the "business of insurance" without a certificate of authority from the Superintendent as required by law.[2] The Commissioners filed suit in the District Court to enjoin the activities of the Association. The court in the order on appeal granted the motion of the Commissioners for summary judgment and denied that of the Association. In the same order the court enjoined the Association, *inter alia*, from engaging in the business of insurance until granted authority to do so by the Superintendent.

· The facts are undisputed. The Association was incorporated in 1939 as a charitable organization under the provisions of 29 D.C.Code § 601. At times material to this litigation membership in the Association was limited to members of the Metropolitan Police Department, the White House Police, and the Park Police. The certificate of incorporation provides that the purpose of the Association is "to furnish financial relief to its members in case of their retirement from the police force, according to the provisions of the constitution and by-laws of the association." The bylaws of the Association provide that each member must deposit $3.00 monthly dues. A member who severs his connection with the police force may withdraw the amount he has paid into the Association, less the sum of $4.00 for each year of his membership. In case of a member's death his widow or other person previously designated by him, or his estate, is entitled to receive the exact amount the member has paid as dues. If a member withdraws but continues in the police force he forfeits the full amount he had paid to the Association.

Upon retirement from the police force a member is entitled to receive $50 for each completed year of membership in good standing, but no member after July 1, 1957, may make deposits after having completed twenty continuous years of membership and has thus acquired the maximum retirement benefit of $1,000. One in this situation would have paid $720 as dues over the twenty-year period.

The Association contends that the plan thus described is a retirement or relief plan similar to a savings club and is not insurance. The Commissioners urge to the contrary that it contains the following requisite features of insurance: (1) the insured [the member] has an interest of some kind susceptible of pecuniary estimation, called an insurable interest; (2) he is subject to a risk of loss through the destruction or impairment of that interest by the happening of designated perils; (3) the Association assumes that

1. 35 D.C.Code § 101 (1961).

2. 35 D.C.Code §§ 404, 1305 (1961).

risk of loss; (4) such assumption is part of a general scheme to distribute actual losses among a large group of persons bearing similar risks; (5) as consideration for the Association's promise the member makes a ratable contribution, usually called a premium, to a general insurance fund. See Vance, Insurance 2 (2d ed. 1930).

Stated somewhat differently, insurance involves essentially a contractual security against anticipated loss. The risk of loss on the part of the insured is occasioned by some future or contingent event, and is shifted to or assumed by the insurer. There is also a distribution of the risk of loss by the payment of a premium or other assessment into a general fund. This permits the insurer to accept each risk at a small fraction of the possible liability upon it. See, e. g., Helvering v. Le Gierse, 312 U.S. 531, 539–540, 61 S.Ct. 646, 85 L.Ed. 996; Jordan v. Group Health Ass'n, 71 App.D.C. 38, 43–44, 107 F.2d 239, 244–245; Home Title Ins. Co. v. United States, 50 F.2d 107, 109–10 (2d Cir. 1931), aff'd, 285 U.S. 191, 52 S.Ct. 319, 76 L.Ed. 695. See, also, 12 Appleman, Insurance Law & Practice §§ 7001, 7002–03 (1943); 1 Couch, Insurance §§ 1:2, 1:3 (2d ed. 1959). And see Securities & Exchange Comm'n v. Variable Annuity Life Ins. Co., 359 U.S. 65, 71–73, 79 S.Ct. 618, 3 L.Ed.2d 640.[3]

Only a strained construction of the features which constitute insurance could bring the Association's plan within them. Let us consider the feature described as the risk of loss through destruction or impairment of the insurable interest by the happening of some peril. We assume there is a likelihood that upon retirement a policeman may suffer some loss of income; but surely this is not the sort of risk of loss due to peril which the definition of insurance contemplates, and if we are wrong about this, still we do not find here the general distribution of the assumption of the risk which is a feature of insurance. The payments upon retirement are principally the amounts of the retirees' own contributions, with some increment of interest earned over the years by investment of the funds in savings accounts.[4] They are not the payments of insurance policies. Cf. State ex rel. Clapp v. Federal Inv. Co., 48 Minn. 110, 50 N.W. 1028.

The business of insurance is not defined in the District of Columbia Code.[5] Nevertheless, the Code is quite detailed as to the regulation and supervision of such a business in this District. From several directions these details shed light on the type of organization which requires a certificate from the Superintendent of Insurance. None of these details seems to apply to this Association. For example, 35 D.C.Code § 102 refers to the issuance of "policies," 35 D.C. Code § 105 refers to "premium receipts" and "losses paid," and 35 D.C.Code § 202 refers to the "payment of indemnity". See note 5, supra. These are not apt descriptions of any of the activities of the Association. Nowhere in the elaborate provisions applicable to the doing of an insurance business in this District is there any clear reference to a retirement plan like that of the Association. Such a plan seems not to have been within the contemplation of Congress; and the legislation is so elaborate that we are not inclined to strain its coverage to include an activity left uncovered by the ordinary

---

3. It should be added that statutes regulating the business of insurance "were not intended for application to all organizations having some element of risk assumption or distribution in their operations." Jordan v. Group Health Ass'n, supra at 48–49, 107 F.2d at 249–250, and authorities there cited.

4. The amounts available for retirement pay may also be augmented by withdrawals from membership.

5. However, a partial definition, within which the Association cannot be placed, is contained in 35 D.C.Code § 202, relating to health, accident and life insurance companies which provide "for the payment of indemnity on account of sickness or accident," or "a benefit in case of death * * *."

**778**

meaning of the language used. Had a non-profit relief or retirement plan of this simple and unambitious character been deemed to be the business of insurance, we feel sure we could find in the numerous Code provisions a more explicit indication to that effect. "Such care and particularity in treatment preclude expansion of the Act in order to include transactions supposed to be within its spirit, but which do not fall within any of its provisions." Ebert v. Poston, 266 U.S. 548, 554, 45 S.Ct. 188, 190, 69 L.Ed. 435.

We are fortified in our conclusion by consideration of the principal purpose sought to be achieved by the regulations set forth in the Code. Many of them relate to the maintenance of reserves, 35 D.C.Code § 202, or to the regulation of investments or the financial operations of the insurer, 35 D.C.Code §§ 1320–21, so as to protect the insured, and thus the public. Jordan v. Group Health Ass'n, supra. They assume a separateness of identity, diversity of ownership, public solicitation of business, and probable conflict of interest between insurer and insured, necessitating regulation for the latter's protection. When the purposes for which these regulations were enacted have no significance in a particular situation this serves as a guide in determining whether a particular activity is not within the regulations. The Association does not solicit public membership, its ranks are limited, and its investments are controlled by the membership. The bylaws provide that investments of funds shall not only be approved by a majority of the Board of Directors, but also by a majority vote of the membership in regular session. The absence of a profit motive and the facts that the Association possesses a representative government and engages in no solicitation of the public, add some though not controlling support to the view that its activities are not within the scope of a statute primarily designed to protect the insured vis-a-vis the insurer.

It may well be that a retirement plan of this or similar character should be subject to legislative regulation, but we do not think Congress has yet brought this about. The return to each member upon retirement of the dues he has paid, plus an additional amount which the plan is designed to accumulate, does not fit into any ordinary definition of insurance, as the Group Health Association was held not to do in Jordan v. Group Health Ass'n, supra.

Reversed.